Rosemarie Hofberg (Spies) v. Commissioner.
Hofberg v. Commissioner
Docket No. 3714-66.
United States Tax Court
T.C. Memo 1968-259; 1968 Tax Ct. Memo LEXIS 39; 27 T.C.M. (CCH) 1375; T.C.M. (RIA) 68259; November 13, 1968, Filed Richard B. Newton, *40 Suite 1146 Rowan Bldg., 458 S. Spring St., Los Angeles, Calif., for the petitioner. Martin R. Simon and Michael Pargament, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in petitioner's income tax for 1964 in the amount of $15,146.81. The principal matter presently in controversy is whether petitioner is chargeable with one-half the gain realized in 1964 in respect of her community interest in 50 percent of the stock of a corporation upon its liquidation. Two other issues relating to petitioner's community interest in her former husband's salary and a part thereof classified as dividends by the Commissioner, which account for a substantial portion of the deficiency, do not appear to be in controversy any longer. [1]
*41 Findings of Fact The parties have filed stipulations of certain facts, which are incorporated herein by this reference. Petitioner, Rosemarie Hofberg (Spies) resided in Santa Barbara, or Los Angeles County, California, during the year at issue and at the time of filing the petition herein. She filed her Federal income tax return for 1964 with the district director of internal revenue in Los Angeles, California. Petitioner married Alan Hofberg (sometimes hereinafter referred to as "Alan") on May 1, 1959. They separated sometime in 1964. On August 14, 1964, they entered into a "Property Settlement Agreement," reciting that they had "agreed to separate and hereafter permanently live apart", and that petitioner had theretofore filed an action for divorce. The agreement primarily concerned marital property rights and support and maintenance. Pertinent portions of the agreement are as follows: II. HUSBAND'S SEPARATE PROPERTY: * * * In addition, husband has funds on deposit in his name in the All State Savings and Loan Association, Los Angeles Federal Savings and Loan Association and the United California Bank in the total approximate amount of $17,500.00 which amount is the sole *42 and separate property of the husband. The said amount was obtained through a prior agreed upon distribution of community funds. III. WIFE'S SEPARATE PROPERTY: * * * In addition, wife has funds on deposit in her name in the Security First National Bank in the approximate amount of $11,250.00 which amount is the sole and separate property of wife. The said amount was obtained through a prior agreed upon distribution of community funds. Wife also owns an interest in an escrow for the purchase of real property located in San Luis Obispo County which is the sole and separate property of the wife. IV. COMMUNITY PROPERTY: The parties hereto agree that they are now possessed of the following property which is the community property of the aforesaid marriage: * * * G. 50% of the issued and outstanding capital stock of Best and Hofberg Inc., a California Corporation. * * * VI. DIVISION OF COMMUNITY PROPERTY: * * * C. The parties acknowledged that the husband is presently in the process of liquidating and winding up all of the affairs of Best & Hofberg Inc. It is expressly agreed that upon liquidation of the said corporation husband shall convey 1376 to wife one-half of all of the *43 cash and other assets he shall receive upon the final liquidation of the said corporation with the exception of any automobile he may receive in kind. With respect to said automobile, wife agrees that same may be the sole and separate property of the husband. * * * X. RELEASE AND WAIVER OF RIGHTS: * * * B. Husband * * * covenants and agrees that if any claim, action or proceeding shall hereafter be brought seeking to hold her [wife] liable on account of any of his debts, liabilities, acts or omissions, he shall, at his sole expense, defend her against any such claim or demand (whether or not well-founded) and that he shall hold her free and harmless therefrom. * * * D. Each of the parties agree that any and all property acquired by either of them from and after the effective date of this instrument shall be the sole and separate property of the one that is so acquiring it; each of the parties waives any and all property rights in and to such future acquisitions hereby granted to the other, all such future acquisitions of property as the sole and separate property of the one so acquiring same from effective date of this instrument. The parties acknowledged that any money or *44 property received by the husband in the liquidation of the corporation known as Best and Hofberg Inc. shall not be subject to the provisions of this sub-paragraph. On August 26, 1964, an interlocutory judgment of divorce was entered in the Superior Court of the State of California for the County of Los Angeles, entitling petitioner to a divorce from Alan one year from the date thereof. The decree incorporated the above property settlement agreement, and in addition contained the following: 9. Upon the liquidation and winding up the affairs of Best and Hofberg, Inc., a California corporation, in which plaintiff and defendant own a fifty per cent (50%) interest as their community property, defendant is ordered to pay and convey to plaintiff one-half of all of the cash and other assets that he shall receive upon the final liquidation of said corporation with the exception of any automobile he may receive in kind upon such liquidation, which automobile shall be his sole and separate property. Petitioner and Alan owned as community property 50 percent of the outstanding capital stock of Best & Hofberg, Inc. (sometimes hereinafter referred to as "Best & Hofberg" or "the corporation"), *45 a California corporation conducting a mail order business. Their cost basis in such stock was $7,500. The remaining 50 percent was owned or controlled by a person named Norman Best. The corporation sometimes did business under the names "National Address-O-Plate Co." and "Western States Claim Adjusters, Inc." Bank accounts in these two names were in fact bank accounts of Best & Hofberg. Petitioner was a director of the corporation but was not an employee. She did some work at home for the corporation, consisting of "typing mailing lists, going over ideas and talking with Mr. Hofberg, discussing ideas, promotions." At some date during the first half of 1964, not precisely fixed in the record, Alan Hofberg, Norman Best and the corporation were indicted, and sometime in mid-1964, but prior to July 1964, the shareholders and directors of the corporation elected to wind up its affairs and voluntarily dissolve. On July 24, 1964, a certificate setting forth such election was filed in the office of the Secretary of State of California, as required by California law. Distributions in liquidation in the amounts of $28,000 each had already been made to Alan Hofberg and Norman Best on June 29, 1964. *46 On September 10, 1964, the directors of the corporation, including petitioner, executed a document certifying under penalty of perjury that, inter alia, the corporation had been completely wound up and dissolved, that all known debts of the corporation actually had been paid, and that all known assets of the corporation had been distributed to the shareholders. This document was filed with the California Secretary of State on September 14, 1964. After September 10 or September 14, 1964, the corporation conducted no business and engaged in no activities other than minor bookkeeping adjustments or possibly other minor acts in connection with winding up its affairs. Alan received cash and certain assets in kind as part of the liquidation proceeds, and he assumed certain liabilities of the corporation. The cash which he thus received was in the aggregate amount of $67,326.84, and was reflected in the following six checks payable to him: 1377 Check Number
Account drawn upon
Date of check
Amount
Description on check stub
1185
National Address-O-Plate Co.
6/29/64
$28,000.00
"Dist. in liquidation." [2]
1194
National Address-O-Plate Co.
9/10/64
13,000.00
"for deposit for Corp. Tax"
1196
National Address-O-Plate Co.
9/10/64
986.55
[not in evidence]
1198
National Address-O-Plate Co.
9/10/64
7,000.00
[None]
1199
National Address-O-Plate Co.
9/10/64
6,607.26
[None]
12197
Western States Claim Adjusters Inc.
9/10/64 11,733.03
[not in evidence]
Total
$67,326.84
*47 In determining the deficiency herein the Commissioner added the foregoing $67,326.84 cash to the assets in kind received by Alan [3] and subtracted corporate liabilities assumed by Alan which he determined to be in the aggregate amount of $13,388.26. From the net amount thus determined as having been received in liquidation he subtracted $7,500, the cost basis of the stock, and attributed one-half of the resulting profit or $29,585, to petitioner as her share of the gain on liquidation of the corporation. Petitioner's share of that gain was in fact $27,410 ($29,585 minus an adjustment in respect of a Cadillac automobile received by Alan as explained in the Opinion hereinafter). *48 On June 29, 1964, Alan deposited the $28,000 check listed in the above table as received as part of the liquidation proceeds from the corporation, in a savings account in his name at the Allstate Savings & Loan Association, opened on the smae day. On July 10, 1964, he withdrew $5,368.20 from the Allstate account. On July 20, 1964, he withdrew $11,146 from the account and converted these funds into a check, drawn on Allstate, payable to petitioner. On July 22, 1964, petitioner deposited the $11,146 check at the Security First National Bank in a joint savings account owned by her and Richard F. Spies, whom she subsequently married. On August 3, 1964, Alan deposited in the Allstate account a check for $2,500 received from the corporation as a salary payment. On August 4, 1964, he deposited a check for $5,000 in the account. On August 10, 1964, he withdrew $11,000 from the account and converted the funds into a check, drawn on Allstate, payable to petitioner. On August 11, 1964, petitioner deposited the $11,000 check in her joint account at the Security First National Bank. The foregoing $11,146 check and $11,000 check of July 20, 1964 and August 10, 1964, respectively, payable to petitioner, *49 represented part of her share of the proceeds of the liquidation of Best & Hofberg. The $13,000 check listed in the above table received by Alan in connection with the liquidation of the corporation was deposited by him in an account for use in discharging the corporation's tax liability. In determining the amount chargeable to petitioner in connection with the liquidation, the amount of that liability together with other corporate liabilities, of lesser amounts, assumed by Alan, was eliminated and only the net amount of the distributions (after subtracting the liabilities assumed by Alan) was used by the Commissioner as a base for determining the net amount of petitioner's one-half community interest therein. Three of the checks received by Alan in liquidation of the corporation, in the amounts of $986.55, $6,607.26, and $11,733.03, or a total of $19,326.84, were deposited on September 11, 1964, in a joint savings account in the names of Alan and petitioner which was opened on that day at the Home Savings and Loan Association of Los Angeles. No other deposits were ever made in this account, and no withdrawals were ever made until the closing of the account in April 1965, as hereinafter *50 set forth. The three checks deposited in this account represented part of the proceeds of the liquidation of Best & Hofberg. As the result of a request formally made by Alan, the account was subject to the condition that no withdrawals could be made therefrom without the signatures of 1378 both Alan and petitioner, but it was the bank's practice in such circumstances to issue a check payable to both account owners if one of them insisted upon making a withdrawal. At the time this account was opened it was contemplated that petitioner and Alan would file a joint Federal income tax return for 1964 and that the funds in the account would be used to pay the taxes due thereunder. However, it was ultimately decided that Alan and petitioner would file separate returns for 1964, and on April 13, 1965, the account was completely liquidated. By that time, as a result of the accrual of interest, the balance in the account had increased to $19,851.71. That entire balance was withdrawn on April 13, 1965 by Alan and petitioner; Alan received a check in the amount of $9,925.85, and petitioner received a check in the amount of $9,925.86. During 1964, Alan received the following payments from *51 the corporation designated as salary. Date Paid
Gross Amount
Jan. 2
$14,000
March 12
13,000
May 4
13,000
July 7
13,000
Aug. 3 4,000
Total
$57,000
Petitioner filed a separate Federal income tax return for 1964 and in it reported no income from the liquidation of the corporation or from the $57,000 paid to Alan by the corporation as wages. In the notice of deficiency, the Commissioner determined that petitioner realized a long-term capital gain of $29,585 in 1964 from the liquidation of the corporation, which amount was not reported on her return. He further determined that she realized unreported income from wages in the amount of $25,855 and unreported dividend income of $3,345, both items representing her community one-half interest in sums paid to Alan. (These latter two items are no longer in controversy. See footnote 1, supra.) Opinion RAUM, Judge: Petitioner and her former husband, Alan Hofberg, owned as community property 50 percent of the outstanding stock of Best & Hofberg, Inc., a California corporation. There is no dispute that their cost basis in that stock was $7,500. The sole issue to be decided is what gain, if any, petitioner *52 realized in 1964 as a result of the liquidation of the corporation. Section 331(a) of the 1954 Code provides that amounts distributed in complete liquidation of a corporation "shall be treated as in full payment in exchange for the stock." Accordingly, to the extent that petitioner's allocable share of the net amount received in liquidation exceeded the basis of the stock she has realized taxable gain. The Commissioner determined that the amount of such gain allocable to petitioner was $29,585. The burden of proof was upon petitioner, and except for an adjustment hereinafter explained, which reduces that amount to $27,410, we find no error in the Commissioner's determination. Petitioner presents a variety of arguments why she should not be charged with realization of income upon the liquidation of Best & Hofberg in 1964. She first asserts that there was in fact no liquidation. At the trial, there was an attempt to show that the corporation did not in fact cease doing business on September 10, 1964, as claimed in a document signed by petitioner and other directors which was filed by the corporation with the State of California. However, we found no convincing evidence to support this *53 view. Petitioner argues further, on brief, that liquidation requires the complete distribution of assets to all shareholders, that the property agreement between petitioner and her former husband effected a division of the stock formerly held by them as community property, that petitioner individually never received her share of the liquidation proceeds, and that therefore there was no liquidation. Without passing on the correctness of petitioner's definition of a liquidation, we are satisfied that the property agreement did not give petitioner a separate property interest in any of the stock. Part IV (G) of the agreement explicitly recognizes the stock in Best & Hofberg as community property, and it does not undertake to divide the stock between the spouses. On the other hand, Part VI (C) of the agreement states that the parties acknowledge that Alan was "in the process of liquidating" the corporation and provides that he shall convey to petitioner one-half of all the cash and other assets received upon final liquidation, with the exception of an automobile. Part X (D) provides that property acquired by the parties subsequent to the agreement will be the separate property of the *54 party 1379 receiving it, but the liquidation proceeds are specifically excepted from this provision. It is thus clear that the stock and any liquidation proceeds were to remain community property even after August 14, 1964, until the proceeds were in fact divided between the parties. The interlocutory divorce decree specifically recognized this arrangement in paragraph 9. Such an arrangement is perfectly proper under California law. It is well-settled that an interlocutory decree does not dissolve the marital relationship, but merely establishes the right of the prevailing party to receive a final decree of divorce after the expiration of one year. Cal. Civil Code, secs. 131 and 132; In re Cummings, 84 F. Supp. 65 (D.C.Cal.); Paulus v. Bauder, 106 Cal. App. 2d 589, 235 P. 2d 422. While section 169.2 of the California Civil Code provides that property received by the husband after an interlocutory decree shall be considered his separate property, [4] nothing has been called to our attention that would preclude the spouses from continuing by agreement the community property status of any specified item of property held as such prior to an interlocutory decree. *55 Moreover, in Harrold v. Harrold, 43 Cal. 2d 77, 81, 271 P. 2d 489, 492, the court stated: "* * * When a divorce is pending the power of a husband over community property exists until the entry of a final decree. Lord v. Hough, 43 Cal. 581; Chance v. Kobsted, 66 Cal. App. 434, 437,; In re Cummings, 84 F. Supp. 65, 69." And there does not appear to be any reason why this rule should be otherwise after enactment of section 169.2. The Best & Hofberg stock being community property at all times, and under Alan's control, it was perfectly proper for the corporation to distribute one-half of the liquidation proceeds to him, as we have found it did. Petitioner's contention that there was no liquidation because the *56 proceeds were not properly distributed to the shareholders is without merit. Petitioner further contends that even if there were a liquidation, she never received, actually or otherwise, any liquidation proceeds. From the discussion above, it is clear that since petitioner at all times had a community one-half interest in 50 percent of the corporation's stock, she realized income immediately upon the distribution of the liquidation proceeds, whether or not she actually received her share from her former husband. When he received the proceeds, he was acting as the manager of the community property in respect of which the proceeds were paid and was therefore acting on behalf of petitioner. Both the property settlement agreement and the divorce decree explicitly recognized Alan's authority in the liquidation to receive the proceeds. Whether he was acting as petitioner's agent by virtue of the community property laws or by virtue of the property settlement agreement, we are convinced that Alan received one-half the liquidation proceeds (with the exception of the automobile) on behalf of petitioner, and that one-half of the gain so realized is taxable to her. In any event, we are satisfied *57 on this record that apart from petitioner's share in the mailing list which was not included in determining her gain, petitioner in 1964 actually received from Alan her full share of the liquidation proceeds. Petitioner's contentions to the contrary are not supported by the evidence. Petitioner argues that the $28,000 check received by Alan from the corporation on June 29, 1964, was not actually a payment in liquidation and that, therefore, any checks drawn on the account into which the $28,000 was deposited and payable to petitioner could not be considered distributions of liquidation proceeds to her. The corporate records establish, and we are convinced by the evidence, that the $28,000 was indeed a distribution in liquidation. We have so found. Alan issued to petitioner two checks from the account in which the $28,000 was deposited. Petitioner admits receipt of the checks but advances various reasons why they should not be considered liquidation proceeds. Petitioner testified that Alan never told her that the checks represented liquidation proceeds but rather said the funds were received from "kickbacks" or refunds, deferred salary, or the repayment of a debt. Alan testified that *58 he told petitioner the funds were from liquidation distributions. There is no evidence except petitioner's testimony that the checks represented anything other than her share of the liquidation proceeds, and we did not find her testimony convincing. 1380 Petitioner argues that the $11,146 check was referred to in the property agreement in Part III as "the approximate amount of $11,250.00" in petitioner's bank account as her separate property, that the agreement was entered before the liquidation of the corporation, and that, therefore, the $11,146 represented a division of community property rather than liquidation proceeds. The agreement, however, in no way implies that no funds had been previously distributed in liquidation. It states that Alan was "in the process of liquidating and winding up" the corporation. There is nothing inconsistent between the agreement and the conclusions that the liquidation had already begun and that some distributions had already been made. Petitioner argues that the $11,000 check was issued from Alan's account after the deposit in that account of admittedly nonliquidation funds. The point is without merit. Regardless of other deposits in that *59 account, there were ample funds in the account from the corporate liquidation to support that payment, and, in any event, Alan could have used any funds in his possession, whatever their source, to pay petitioner part or all of her share of the liquidating distributions. Petitioner's final contention with regard to actual receipt concerns the three checks totalling $19,326.84 deposited in a joint account owned by petitioner and Alan. The account contained a restriction that no withdrawals could be made without both signatures. No withdrawal was in fact made until April 13, 1965. Petitioner contends that she cannot be charged with receipt of one-half of the deposit in 1964 because of the restriction on withdrawal. See sec. 1.451-2(a), Income Tax Regs. While it was Alan alone who signed the document requesting the bank to impose the restriction on withdrawal, there is no evidence that petitioner did not consent to the arrangement or that the imposition of the restriction was a condition of her receipt of the funds. The restriction was as much for her benefit as it was for Alan's, for it precluded Alan from making any withdrawals and thus diluting petitioner's *60 interest in the account. The amount placed on deposit on September 11, 1964, was as much hers as it was his on that date. The fact that they consented to an arrangement whereby neither could withdraw it without the concurrence of the other does not make it any the less an actual receipt in 1964. Thus, the petitioner must be charged with having actually received her one-half of that deposit of $19,326.84 in 1964, or $9,663.42. And when this amount is added to the other two amounts which we have found were in fact received by petitioner in 1964 as her share of the liquidating distributions, namely, $11,146 and $11,000, petitioner received a total of no less than $31,809.42 in 1964 as her share of the liquidation of Best & Hofberg, a sum that more than covers the amount of gain ($27,410) that we find properly chargeable to her plus the return of her one-half share of the $7,500 basis. See infra. The final problem with respect to the liquidation income concerns the precise amount includable in petitioner's income. The net amount received by Alan must first be determined. The statutory notice of deficiency charged petitioner with gain from the liquidation in the amount of $29,585. *61 This assumed a distribution to Alan in the net amount of $66,670 from which the $7,500 basis was subtracted, leaving a total net gain of $59,170, one-half of which, or $29,585, was attributed to petitioner. However, a Form 1099L filed by the corporation, which is in evidence, reported a net distribution to Alan of $66,170.29. This form valued a 1963 Cadillac car received by Alan as part of the liquidation proceeds at $3,850. On brief, the Commissioner explained the discrepancy between the $66,670 and $66,170 figures as the result of his revaluation of the automobile from $3,850 to $4,350. The record contains no evidence as to the value of the car when distributed. We think, however, that the provisions of the property agreement and interlocutory divorce decree make the issue of the value of the car irrelevant to this case. The agreement reads in pertinent part: * * * It is expressly agreed that upon liquidation of the said corporation husband shall convey to wife one-half of all of the cash and other assets he shall receive upon the final liquidation of the said corporation with the exception of any automobile he may receive in kind. With respect to the said automobile, wife agrees *62 that same may be the sole and separate property of the husband. The decree reads in pertinent part: * * * defendant is ordered to pay and convey to plaintiff one-half of all of the cash and other assets that he shall receive upon the final liquidation of said corporation with the exception 1381 of any automobile he may receive in kind upon such liquidation, which automobile shall be his sole and separate property. In our view, the Commissioner's position that the value of the car (whatever it may be) should be included in the amount of liquidation proceeds to be divided between petitioner and Alan is erroneous. Both the decree and the agreement clearly provide that the car is not to be considered as part of the amount to be so divided. It is proper under California law for the parties to make such an adjustment of their community property rights. Baxter v. Baxter, 3 Cal. App. 2d 676, 40 P. 2d 536, cf. Cal. Civil Code secs. 159 and 160. Thus, the car, whatever its value, may not be included in determining petitioner's share of the net liquidating distributions. Accordingly, the net amount of the liquidating distributions must be scaled down to $62,320, and after *63 subtracting the $7,500 basis therefrom, there is a net gain of $54,820, of which petitioner's one-half allocable share is $27,410. Petitioner's other arguments with respect to the amount received by petitioner may be quickly disposed of. Petitioner argues that she was not credited with Alan's assumption of liabilities to any extent. It is, however, perfectly plain that the assumption of liabilities was taken into account by the Commissioner in determining the net amount of the liquidation proceeds received by Alan. Petitioner argues that Alan received property other than cash and that she did not. It is, however, clear that petitioner received enough cash to cover her share of the other property. Petitioner argues that Alan received a mailing list of which she received no part. The Commissioner, however, did not even know of the mailing list when the deficiency was determined, and, as already noted, its value was clearly not included in the amount asserted to have been received by Alan. There is no merit in any of these arguments. Decision will be entered under Rule 50. Footnotes
1. No argument is presented in petitioner's brief or reply brief in respect of these two issues and, in referring to these two issues, representations were made to the Court in the Government's brief that "[the] parties have by written stipulation of facts, removed from controversy the issue of petitioners [sic] liability for additional income from wages in the amount of $25,855.00 and her liability for additional income from dividends in the amount of $3,345.00", although no such stipulation appears to have been filed with the Court. Petitioner's reply brief does not contradict these representations.↩
2. This stub originally read "Dist. of Funds." The last two words are crossed out and "in liquidation" substituted.↩
3. The value of the assets in kind, as determined by the Commissioner, does not clearly appear in the record, nor was any satisfactory evidence presented as to the value of such assets. However, the record shows that in addition to the assets in kind taken into account by the Commissioner, Alan received a valuable mailing list from the corporation of which the Commissioner was unaware when he determined the deficiency, but he has not since sought any increased deficiency in respect thereof, nor has he sought in any other manner to have the value thereof taken into account in respect of the total amount received in liquidation by Alan.↩
4. Prior to the enactment of section 169.2 in 1959, in the absence of any provision to the contrary in a property settlement agreement or interlocutory divorce decree, property acquired by the husband after the entry of an interlocutory decree, but before a final decree, was community property. Franklin v. Franklin, 67 Cal. App. 2d 717, 721, 155 P. 2d 637, 639. Cf. Ethel B. Dunn, 3 T.C. 319, 320↩.